COURT OF APPEALS OF VIRGINIA


Present:  Judges Willis, Lemons* and Frank
Argued at Chesapeake, Virginia


TOBIN J. JONES
                                            OPINION BY
v.    Record No. 2598-98-1       JUDGE JERE M. H. WILLIS, JR.
                                          MARCH 21, 2000
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                  John C. Morrison, Jr., Judge

          James O. Broccoletti (Zoby & Broccoletti,
          P.C., on brief), for appellant.

          Virginia B. Theisen, Assistant Attorney
          General (Mark L. Earley, Attorney General, on
          brief), for appellee.


     On appeal from his conviction of first degree murder of his

wife, Megan Jones, in violation of Code § 18.2-32, Tobin J.

Jones contends that the trial court erred (1) in denying his

motion to suppress evidence seized from the home that he

formerly shared with his wife, (2) in finding that he

voluntarily consented to the search of the home, (3) in

admitting evidence of his status in a pretrial release program

for a prior offense and his violation of the conditions of that

program, (4) in refusing to strike testimony due to the

Commonwealth's failure to disclose statements made by him to

_____
     * Justice Lemons participated in the hearing and decision of
this case prior to his investiture as a Justice of the Supreme
Court of Virginia.

members of the sheriff's department, (5) in admitting into evidence several letters written by him prior to trial, (6) in refusing to grant a continuance or mistrial based on the Commonwealth's untimely disclosure of exculpatory evidence, and (7) in refusing to grant a mistrial based upon the Commonwealth's failure to disclose certain of his statements to his mental health evaluators. Finding no reversible error, we affirm the judgment of the trial court.

## I. Background

Prior to May 1996, Jones and Megan shared a residence on Delaware Avenue in Norfolk. In May 1996, they separated and Jones moved to 1701 Longwood Avenue. Late on the evening of May 11, 1996, a witness saw the Joneses walking together near the Delaware Avenue home. A few hours later, the home's alarm system was tripped. Jones called the alarm system company and reported that he had accidentally set off the alarm. Soon thereafter, neighbors heard loud music coming from the house. The next day, Jones called two women and asked them for dates, telling one that he was calling from the house while Megan was resting.

On May 15, 1996, Jones was arrested outside the Delaware Avenue house on other charges. At that time, the police seized from him a key that opened the interior doors in the house. The following day, he was released pursuant to a pretrial monitoring

program, which required him to wear an electronic surveillance bracelet at all times and to remain in his Longwood Avenue home.

On the morning of May 18, 1996, while investigating a report from Megan's parents that she was missing, police found Jones at the Delaware Avenue residence, mowing the lawn. He had cut off his electronic surveillance bracelet. Also at the house was a U-haul truck, which was overdue for return. Jones explained that he planned to transport some of Megan's belongings to a house in North Carolina. The police came onto the property to discuss Megan's whereabouts with Jones and walked to the rear of the yard to look around. Jones did not object. One of the officers detected a foul odor, which he associated with a decomposing body, emanating from the rear of the house and observed a large congregation of flies at an upstairs window. Jones offered a ladder so that the police could look into the second floor window. Looking through the window, an officer saw a bundle wrapped in blankets in the middle of the room.

Meanwhile, Jones was arrested for violating the conditions of his pretrial release, was handcuffed, and was placed in the back of a police car. Investigator Hockman took Jones out of the police car, had the handcuffs removed, and questioned him about the ownership of the house. Jones stated that he was an owner of the house and that his name was on the deed. He authorized the police to enter the house and signed a consent

form to that effect.  He told the police that a key to the house was on the patio.  However, that key fit no outside door.

Investigator Dunn climbed the ladder into the second floor bedroom.  Finding the door to that room locked, he removed it from its hinges to gain entry to the remainder of the house, which he found unoccupied and secure.  Dunn testified that he would not have entered the house without Jones' consent and that had Jones refused consent, he would have pursued other means to gain lawful entry.

Unwrapping the bundle located in the upstairs bedroom, the police found Megan Jones' decomposing body.  The medical examiner testified that she had been dead approximately one week.

## II.  Motion to Suppress

Jones' first two assignments of error relate to the search of the Delaware Avenue house.  He contends that the trial court erred in ruling that his consent to search the house was given freely and in refusing to suppress the evidence found in the house.  We hold that Jones' consent was freely and voluntarily given and that his consent justified the warrantless search of the house.

The Commonwealth contends that because Jones and Megan had separated and Jones had moved his residence to Longwood Avenue, he lacks standing to object to a search of the Delaware Avenue property.  We disagree.  Although Jones had moved his residence,

he remained a co-owner of the Delaware Avenue property, had recent and apparently continuing access to it, and routinely and frequently visited the property for proprietary purposes, such as mowing the grass.  We hold that under these circumstances, he enjoyed a reasonable expectation of privacy in the property.  We note that this expectation was reasonable, not absolute.  The level of privacy that may reasonably be expected in an open yard is not necessarily the same as would reasonably be expected behind the closed door of a dwelling.  See Shaver v. Commonwealth, 30 Va. App. 789, 795-96, 520 S.E.2d 393, 396-97 (1999).

"Ultimate questions of reasonable suspicion and probable cause . . . involve questions of both law and fact and are reviewed de novo on appeal. . . . [We are, however,] bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them . . . ." McGee v. Commonwealth, 25 Va. App. 193, 197-98, 487 S.E.2d 259, 261 (1997) (en banc).

Jones argues that although he furnished the ladder by which the police first looked through the upstairs rear window, he did not do so until after the police invaded the privacy of his backyard without a warrant.  He argues that it was not until the police invaded the privacy of his backyard that they first detected the foul odor emanating from the house, observed the congregation of flies on the window, became suspicious, and

pursued further inquiry.  Thus, he argues, his concession in producing the ladder was in response to an inquiry that derived from an unlawful intrusion onto his property.  He argues that the entire course of investigation, including the ultimate search of the house, resulted from and was tainted by this unlawful intrusion and, thus, was constitutionally flawed.  We disagree.

The police went to the Delaware Avenue home looking for Megan.  She had not been seen or heard from for several days.  Her parents had been unable to contact her.  They had lodged a missing person report and had sought police assistance in locating her.

When the police initially went to the Delaware Avenue house on May 18, 1996, they were not investigating a crime.  They had no basis for believing that a crime had been committed and thus had no ground on which to obtain a search warrant.  See Code § 19.2-54.  Rather, the police were engaged in what is frequently termed their community caretaking function, the maintenance of public order and the rendition of assistance to persons needing or seeking that assistance.  We gauge the reasonableness of their conduct in the context of their

performance of that function, under the circumstances they encountered upon arriving at the Delaware Avenue home.[1]

Arriving at the home, the police saw Jones in the yard mowing the grass. They could have stood on the sidewalk and shouted at him, but considering the benign purpose of their visit, we hold that it was reasonable for them to approach Jones in the yard. The reasonableness and propriety of this approach is reinforced by Jones' demonstrated lack of disapproval and his willingness to talk to the police. We further hold that under these circumstances and in the absence of any objection by Jones, thereby suggesting consent, the police acted reasonably in walking to the rear of the yard, in order to look for Megan or for some indication of her whereabouts. At this point, they detected the foul odor, which they immediately associated with a decomposing body, and observed the flies. The entire subsequent investigation flowed from the suspicion aroused by those perceived facts and from Jones' cooperation and freely-given consent.

Jones contends that because he was under arrest when he consented to the police entry of the house, that consent was not given freely and voluntarily.

---

[1] Because the ultimate police entry into the house was pursuant to Jones' consent, we do not address whether the community caretaking function would have authorized such an entry.

"The fact that a defendant is in custody at the time the consent is given does not of itself invalidate the consent." Commonwealth v. Rice, 28 Va. App. 374, 378, 504 S.E.2d 877, 879 (1998). Before requesting consent to enter the house, the police removed Jones from the police vehicle and disengaged the handcuffs. See Gregory v. Commonwealth, 22 Va. App. 100, 109, 468 S.E.2d 117, 122 (1996).

> The question of whether a particular "consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances."

Deer v. Commonwealth, 17 Va. App. 730, 735, 441 S.E.2d 33, 36 (1994) (citation omitted).

When he consented to the search of the house, Jones was not handcuffed and had been removed from the police car. The record discloses no evidence of coercion. Although Investigator Dunn testified that he did not "believe" he had advised Jones of his right to refuse consent, Investigator Hockman testified that Dunn gave that advice. The consent form itself recites the right to refuse. Under these circumstances, we hold that Jones' consent to entry and search of the house was freely and voluntarily given.

Because Jones' consent was voluntary, and the police acted pursuant to it, the search of the house was valid. The police reasonably believed that Jones retained a possessory interest in

the home.  He informed them that his name remained on the deed and that he was often at the home to perform custodial tasks. He told them the location of a spare key.  They had arrested him from that house only a few days earlier.  At the time of the search, "the facts available to the officer at that moment . . . 'warrant[ed] a man of reasonable caution in the belief that the consenting party had authority over the premises.'"  Illinois v. Rodriquez, 497 U.S. 177, 188 (1990) (citation omitted).  Thus, the police had valid consent to search the house.

### III.  Evidence of Pretrial Release and Violation

Jones contends that the trial court erred in admitting evidence of his prior bad conduct.  At trial, testimony was introduced that on May 18, 1996, Jones was free on a pretrial release program, awaiting trial for another crime.  The program included at-home detention with an electronic monitoring bracelet.  On May 18, when the police found Jones at the Delaware Avenue house, he had cut off the bracelet and left his home.  By escaping the monitoring system, he violated the terms of the pretrial release program.

The trial court ruled that the evidence relating to Jones' pretrial monitoring and his violation of the monitoring requirements supported the inference that he had guilty knowledge of Megan's death and that he was preparing to cover up his involvement in her death.  Prior to admitting this evidence,

the trial court instructed the jury as to the purpose for which they could consider it, stating:

> You may consider that only as evidence of the defendant's knowledge of anything in this case.  It may not be considered for any other reason, nor should you in any way speculate as to why the defendant may have been on the electronic home monitoring as bears on this case.

Several of the witnesses who testified for the Commonwealth knew Jones because of his participation in the pretrial release program.  His participation in, and subsequent violation of, the house arrest was entwined with evidence that he claimed a set of keys, including keys to the Delaware Avenue house, so that he could go to North Carolina, suggesting a plan to cover up the crime.  An accused is not entitled "to have the evidence 'sanitized' so as to deny the jury knowledge of all but the immediate crime for which he is on trial."  Scott v. Commonwealth, 228 Va. 519, 526-27, 323 S.E.2d 572, 577 (1984).

Furthermore, Jones has demonstrated no prejudice resulting from the admission of this evidence.  "The responsibility of balancing [the prejudice to the defendant and the probative value of the evidence] is largely within the sound discretion of the trial court . . . ."  Coe v. Commonwealth, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986).  We cannot say, as a matter of law, that the trial court abused its discretion in admitting this evidence.

## IV.  Statements Made to Sheriff's Employees

Jones contends that the trial court erred in admitting the testimony of Dora James, Minnie Woods, and Lieutenant Nathaniel Blunt, employees of the Norfolk Sheriff's Department, concerning statements made by him to them.  He argues that, in violation of a discovery order tracking the language of Rule 3A:11, the Commonwealth failed to inform defense counsel of statements made by him to these employees.  The discovery order states, in relevant part:

> It is further ordered that the Commonwealth's Attorney permit counsel for the defendant to inspect and copy or photograph any relevant written or recorded statements or confessions made by the accused, or copies thereof, or the substance of any oral statements or confessions made by the accused to any law enforcement officer . . . .

Jones waived this argument as to the testimony of James and Lieutenant Blunt.  His only objection to Lieutenant Blunt's testimony was made on the ground of hearsay, in response to Blunt's testimony that Jones had been "creating a ruckus."  At the beginning of James' testimony, defense counsel objected based on his pretrial arguments, which addressed only the admissibility of evidence relating to Jones' violation of the pretrial release program.  After James completed her testimony, defense counsel requested a sidebar conference to object to her testimony.  Objection made as to the admissibility of evidence is timely only if raised when the questioned statement is made.

See Rule 5A:18; Harward v. Commonwealth, 5 Va. App. 468, 473, 364 S.E.2d 511, 513 (1988). At no proper time did Jones object to the testimony of Lieutenant Blunt or James on the basis he now raises. See Rule 5A:18; Ohree v. Commonwealth, 26 Va. App. 299, 307-08, 494 S.E.2d 484, 488-89 (1998).

Our remaining inquiry is whether Woods was "law enforcement personnel" under the discovery order. The Commonwealth argues that the definition of a law enforcement officer, as found in Code § 9-169, does not include a ministerial employee such as Woods.

> "Law-enforcement officer" means any full-time or part-time employee of a police department or sheriff's office which is a part of or administered by the Commonwealth . . . and who is responsible for the prevention and detection of crime and the enforcement of the penal, traffic or highway laws of this Commonwealth . . . .

Code § 9-169(9). Woods was employed by the Norfolk Sheriff's Department as an "electronic surveillance supervisor . . . ." Her duties included monitoring individuals released through the pretrial program and making certain they complied with its requirements. If faced with a violation of the program or of any other law, her duty required her to report such violation to the proper authority. However, although she was expected to report observed violations to a law enforcement officer, she carried no badge, had only a civilian identification card, had no arrest authority, and could not enforce the law. Thus, she was not a law enforcement officer "who is responsible for the prevention and detection of crime and the enforcement of the penal, traffic

or highway laws." Id. The trial court correctly found no discovery violation.

## V. Admission of Letters

Jones contends that the trial court erred in admitting into evidence several letters written by him during the time that he was declared incompetent to stand trial. He argues that his mental condition rendered him incompetent to testify as a witness and, therefore, the letters should not have been admitted into evidence.

Jones wrote several letters while his mental health was being evaluated before trial: (1) Commonwealth's Exhibit 103, to Bonnie Lambert on March 21, 1996, (2) Commonwealth's Exhibit 104, to Lambert on August 11, 1996, (3) Commonwealth's Exhibit 105, to Lambert on September 3, 1996, (4) Commonwealth's Exhibit 107, to Allison Wermes on June 13, 1996, and (5) Commonwealth's Exhibits 113 and 114, to Vicki Clark on August 9 and 10, 1996.

Jones did not object to the introduction of Commonwealth's Exhibits 103, 104, 105, and 107, and so cannot contest their admission. See Rule 5A:18; Harward, 5 Va. App. at 473, 364 S.E.2d at 513 ("To be timely, an objection must be made when the occasion arises - that is, when the evidence is offered . . . .").

Jones objected at trial to the admission of Commonwealth's Exhibits 113 and 114 on the ground that, at the time the letters were written, he had been judged incompetent to stand trial.

Jones appears to assert that the tests for incompetence to testify and incompetence to stand trial are equivalent. They are not.

A criminal defendant is incompetent to stand trial if he "lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense." Code § 19.2-169.1. A witness is competent to testify, however, if he "possesses the capacity to observe, recollect, communicate events, and intelligently frame answers to the questions asked of him or her with a consciousness of a duty to speak the truth." Greenway v. Commonwealth, 254 Va. 147, 153, 487 S.E.2d 224, 227 (1997). These tests are not equivalent, and Jones' incompetence to stand trial does not, per se, render him incompetent to be a witness or render his statements inadmissible. "The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988). The trial court ruled that Jones' incompetence to stand trial at the time of writing the letters affected the weight to be given the letters as evidence, not their admissibility. We find no abuse of discretion in that ruling.

### VI. Disclosure of Russell Hurdle's Testimony

Jones' final two assignments of error pertain to testimony by Russell Hurdle, Jones' former cellmate. Hurdle testified

that Jones confessed his wife's murder soon after his incarceration.

On May 18, 1996, Jones was confined in a holding cell at the Norfolk Police Department with Hurdle, who was being held for feloniously forging a traffic summons. Hurdle testified that while in the holding cell, he asked Jones why he was being held. Jones showed Hurdle his arrest warrant, charging him with the murder of "Jane Doe." Jones told Hurdle that he was a psychiatrist. Hurdle suggested that Jones could plead insanity. Jones agreed and then told Hurdle that he had committed the murder and that "Jane Doe" was actually his wife.

Hurdle testified at trial that he had pled guilty to the forgery charge, as well as to prior convictions of possession of cocaine eleven years earlier and of petit larceny thirteen years earlier. He testified that he had received no consideration from the Commonwealth in exchange for his testimony at Jones' trial.

Defense counsel received a copy of Hurdle's criminal record just prior to Hurdle's testimony. Upon conclusion of the Commonwealth's direct examination of Hurdle, defense counsel moved for a mistrial based on the untimely disclosure of Hurdle's criminal record. He argued that the record was exculpatory evidence, because he expected to use it to impeach Hurdle's testimony. See Brady v. Maryland, 373 U.S. 83 (1963).

> "A defendant cannot simply allege the presence of favorable material and win reversal of his conviction." Rather, the defendant must prove the favorable character of the evidence he claims has been improperly suppressed. Speculative allegations are not adequate.

Hughes v. Commonwealth, 18 Va. App. 510, 526, 446 S.E.2d 451, 461 (1994) (en banc) (citations omitted). Arguing for a mistrial, defense counsel speculated that he needed time to investigate the record and to seek further information on Hurdle's prior convictions, on his prior arrests for which there was no disposition recorded, as to other possible charges, and as to any favorable plea agreement located in the file. Because defense counsel did not proffer specifically any evidence that might have impeachment value, he did not show a Brady violation.[2]

Furthermore, Jones has shown neither that the evidence was suppressed, nor that he suffered prejudice. Defense counsel had a copy of Hurdle's criminal record at the time Hurdle testified. Counsel was able to cross-examine Hurdle effectively and to inquire into the plea agreement and its possible effects on Hurdle's credibility. Hurdle admitted the forgery and the prior convictions. The record shows no un-admitted evidence of impeachment value.

Jones also argued for a mistrial on the ground that the Commonwealth had not released Hurdle's statements to Jones'

---

[2] Hurdle's criminal record is not a part of the record.

mental health examiners.  He concedes that Code § 19.2-169.1 does not require such disclosure, but argues that upon receipt of Dr. Voskanian's report finding him competent to stand trial, the Commonwealth had a duty to correct certain misapprehensions held by Dr. Voskanian.  He asserts that he did not plead insanity because the two mental health examiners assigned to his case did not agree that he was legally insane at the time of the murder.

Jones asserts that Dr. Voskanian's assessment of his mental state was based on the assumption that he had not confessed freely to the crime for a long time, thus implying that he knew that his act was criminal.  He argues that had Dr. Voskanian known of his early confession to Hurdle, the doctor's diagnosis might have been different.  However, Jones did not call Dr. Voskanian to proffer what effect, if any, knowledge of Hurdle's testimony would have had on his report.  Thus, Jones has demonstrated no prejudice.  See Smith v. Commonwealth, 16 Va. App. 630, 635, 432 S.E.2d 2, 6 (1993).

The judgment of the trial court is affirmed.

Affirmed.