# CIRCUIT COURT OF THE CITY OF SUFFOLK

Commonwealth of Virginia

v.

Ernest Eugene Brown

November 15, 2000

Case No. CR00-620

BY JUDGE D. ARTHUR KELSEY

The Commonwealth accuses Ernest Brown of third-offense petit larceny in violation of Va. Code Ann. § 18.2-104 (Michie 1996). In his pretrial motion to suppress, Brown argues that the Commonwealth questioned him illegally and conducted a search in violation of the Fourth Amendment to the United States Constitution. *See* Defendant's Motion to Suppress (Sept. 1, 2000); Defendant's Letter Brief (Oct. 16, 2000). For the following reasons, the Court disagrees.

On May 30, 2000, Officer R. M. Bond of the Suffolk Police Department received word from the dispatcher to investigate a complaint called in from "a citizen advising [that] two black males and one black female with a clothing description [were] running at a high rate of speed behind the Redevelopment and Housing Authority carrying a white plastic bag." Hearing Transcript at 8-9 (Sept. 28, 2000). The female, according to the witness, "tried to open a locked door" at the Authority in a state of "panic." *Id.* at 9-10, 11, 21. When the female saw "the clean-up personnel, she ran away." *Id.* at 23. The witness also said that, after the female tried to open the locked door, all three individuals started "running down the street at a high rate of speed." *Id.* at 10, 11. The attempted entry into the Authority office took place at about 7:00 p.m., about two hours after it had closed for the day. *Id.* at 20. The whole scene, the witness explained, involved "very suspicious activity." *Id.* at 10.

Officer Bond arrived at the Authority and questioned the witness personally, along with Officer T. L. Cooper. *Id.* at 16-17. The witness explained that she saw the female try to open the locked door, accompanied by "other subjects." *Id.* at 12; *see also id.* at 17. From the witness's perspective, "all three subjects were together" just before and just after the female tried to open the locked door. *Id.* at 36; *see also id.* at 37.

The witness told Officer Cooper that "she saw two black males running west down toward Pinner Street carrying two white bags." *Id.* at 23. The female "had a white bag in her possession also." *Id.* The witness repeated that the three suspects "were running at a high rate of speed as if to get away from somewhere. . . ." *Id.* at 19. The witness pointed out the direction the suspects had run. *Id.* at 15. Within thirty to forty-five seconds, Officers Bond and Cooper found the suspects. *Id.* at 14-15. All three were "walking" together in a "group" when the officers approached them. *Id.* at 14, 26, 34.

When the officers approached the group, Officer Cooper asked the female why she tried to open the locked door. *Id.* at 34. She said she needed to use the restroom. *Id.* Cooper then noticed that Brown had two of the plastic bags; the female had one. *Id.* at 34-35. At some point after Brown took possession of all the bags, Officer Cooper asked, "What's in the bags?" *Id.* Brown replied, "It's some food items. I just got them from my sister's house." *Id.* "They belong to me," he stated. *Id.* Officer Cooper asked Brown if he had "a receipt for the merchandise." *Id.* at 27. Brown "said no." *Id.*

Officer Cooper then asked for consent to conduct a search. *Id.* at 28-29. Brown agreed, *id.*, and Cooper found several grocery food items — including some sardines, baby oil, and still-frozen sausage. *Id.* at 27, 30. Officer Cooper again asked if Brown had a receipt for the merchandise. *Id.* at 29, 37. Brown repeated that "he had gotten the items from his sister's house." *Id.* Cooper asked Brown where his sister lived. *Id.* at 31. Brown initially said "around the corner," but then "changed it and said on Fourth Street." *Id.* Brown then refused to give his sister's name or telephone number. *Id.*

Realizing that a local grocery store was less than a "half a mile" or so away, Cooper decided at that point that Brown should be "detained" for further investigation. *Id.* at 25, 29. This decision rested on the witness's observations of the group's suspicious behavior, the group's running away from the "general direction" of a local grocery, *id.* at 37, Brown's decision to take possession of all of the bags and to declare his ownership over them, Brown's suspicious failure to have a receipt for still-frozen grocery items, and his unpersuasive and incomplete explanation of where he obtained the items.

Officer Cooper then took about "fifteen to twenty minutes" checking with nearby grocery stores. *Id.* at 29. Upon the completion of this additional

investigation, Officer Cooper placed Brown under arrest for third-offense petit larceny. Among other things, the Commonwealth seized the grocery·items as evidence of Brown's alleged guilt. The Commonwealth also seeks to use against Brown the statements he made during the conversations with Officer Cooper.[1]

Brown moves to suppress all evidence obtained during the investigation conducted by Officers Bond and Cooper. *See generally* Va. Code Ann. § 19.2-60 (Michie 2000). Brown claims the officers violated the Fourth Amendment at three levels.[2] First, Brown believes the circumstances fell below the reasonable-suspicion standard for an investigatory detention. Second, Brown argues that the questioning of him exceeded any legitimate basis for the stop. Finally, Brown asserts the officers illegally inspected the contents of the plastic bags.

We begin with the premise that the Fourth Amendment "does not proscribe all seizures, only those that are 'unreasonable'." *Hodnett v. Commonwealth*, 32 Va. App. 684, 690, 530 S.E.2d 433, 436 (2000) (quoting *Welshman v. Commonwealth*, 28 Va. App. 20, 30, 502 S.E.2d 122, 126-27 (1998) (*en banc*)); *Hamlin v. Commonwealth*, 33 Va. App. 494, 499, 534 S.E.2d 363, 365 (2000) (citation omitted). The reasonableness test involves a balancing of "the individual's right to be free from arbitrary government intrusions against society's countervailing interest in preventing or detecting crime and in protecting its law enforcement officers." *Id.* The validity of a seizure, moreover, "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken."

---

[1] The Court's findings of fact must necessarily resolve evidentiary conflicts, ·including inconsistencies between, as well as within, either side's case. "When weighing the evidence, the fact finder is not required to accept entirely either the Commonwealth's or the defendant's account of the facts, but may reject that which it finds implausible, and accept other parts which it finds to be believable." *Collado v. Commonwealth*, 33 Va. App. 356, 363, 533 S.E.2d 625, 628-29 (2000) (quoting *Pugliese v. Commonwealth*, 16 Va. App. 82, 92, 428 S.E.2d 16, 24 (1993) (internal quotation marks omitted).

[2] Evidence obtained in violation of the Fourth Amendment "is inadmissible in a criminal prosecution for a charged criminal violation pertaining to the seized evidence." *Anderson v. Commonwealth*, 20 Va. App. 361, 363, 457 S.E.2d 396, 397 (1995), *aff'd*, 251 Va. 437, 470 S.E.2d 862 (1996). To the extent Brown invokes constitutional guarantees arising under Article I, § 10, of the Virginia Constitution, the state law analysis tracks the federal law interpreting the Fourth Amendment of the U.S. Constitution. *See Henry v. Commonwealth*, 32 Va. App. 547, 551, 529 S.E.2d 796, 798 (2000).

*Hamlin*, 33 Va. App. at 499, 534 S.E.2d at 365 (citations and internal quotation marks omitted).

Under the Fourth Amendment, the constitutional scrutiny applied to a police encounter with a citizen has a direct correlation to the diminution of the citizen's freedom. "Fourth Amendment jurisprudence recognizes three categories of police-citizen confrontations: (1) consensual encounters, (2) brief, minimally intrusive investigatory detentions, based upon specific, articulable facts, commonly referred to as *Terry* stops, and (3) highly intrusive arrests and searches founded on probable cause." *Wechsler v. Commonwealth*, 20 Va. App. 162, 169, 455 S.E.2d 744, 747 (1995) (citation omitted); *see also McGee v. Commonwealth*, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*).

As this Court has observed before,[3] nothing in judicial precedent or in the day-to-day experience of law enforcement suggests that each case must neatly fit in one of the three categories to the exclusion of the others. A police encounter may begin as a consensual conversation and then evolve into a coercive *Terry* stop or an outright arrest, with the citizen's freedom being diminished incrementally. And, as this happens, the Fourth Amendment demands at each incremental step more exacting justifications for the loss of freedom experienced by the citizen. The same phenomenon can occur in inverse order, with the citizen's freedom incrementally restored. *See, e.g., Ohio v. Robinette*, 519 U.S. 33 (1996) (a consensual encounter may immediately follow the issuance of a traffic summons without violating the Fourth Amendment).

Consensual encounters, whether they involve questioning or searches, simply "do not implicate the Fourth Amendment." *McGee*, 25 Va. App. at 198, 487 S.E.2d at 261; *Payne v. Commonwealth*, 14 Va. App. 86, 88, 414 S.E.2d 869, 870 (1992); *Iglesias v. Commonwealth*, 7 Va. App. 93, 99, 372 S.E.2d 170, 173 (1988). Police officers, for example, "do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen. . . ." *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion). *See, e.g., Williams v. Commonwealth*, 21 Va. App. 263, 266, 463 S.E.2d 679, 680 (1995); *Buck v. Commonwealth*, 20 Va. App. 298, 301-02, 456 S.E.2d 534, 535 (1995). "While most citizens will respond to a police request, the fact that people do so, and do so without being told that they are free not to respond, hardly eliminates the consensual nature of the response." *Baldwin v. Commonwealth*,

---

[3] *See Commonwealth v. Ridley* (2000), which is printed above at page 410.

243 Va. 191, 197, 413 S.E.2d 645, 648 (1992) (quoting *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984) (citations omitted)).

Put another way, a "consensual encounter occurs when police officers approach persons in public places to ask them questions, provided a reasonable person would understand that he or she could refuse to cooperate." *Payne*, 14 Va. App. at 88, 414 S.E.2d at 870 (internal quotations and citations omitted). The reasonable person standard employs an objective test, not a subjective one turning on the individual's perceptions alone. The protection afforded by the Fourth Amendment "does not vary with the state of mind of the particular individual being approached." *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988). An objective test, therefore, governs both the actions of the questioning officer as well as the reactions of the individual being questioned. It also "presupposes an innocent person" — that is, the test focuses not on whether an objectively reasonable *criminal* might feel intimidated by a conversation with a police officer, but how an *innocent citizen* would feel about it. *Baldwin*, 243 Va. at 197, 413 S.E.2d at 648 (quoting *Florida v. Bostick*, 501 U.S. 429, 438 (1991)).

Among other things, trial courts should consider "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Commonwealth v. Satchell*, 15 Va. App. 127, 131, 422 S.E.2d 412, 414-15 (1992) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Added to this list should be the question of whether the encounter took place in a public place or on private property. *See generally Parker v. Commonwealth*, 255 Va. 96, 102, 496 S.E.2d 47, 50 (1998) (plurality opinion by Hassell, J., joined by two other Justices).

The analysis, however, is "necessarily imprecise" given the multitude of circumstances that must be considered. *Parker*, 255 Va. at 102, 496 S.E.2d at 50 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). This imprecision becomes more pronounced, and understandably so, when the encounter with a law enforcement officer *deescalates* from a coercive *Terry* stop to an allegedly consensual conversation. *See Reittinger v. Commonwealth*, 260 Va. 232, 532 S.E.2d 25 (2000) (coercive automobile stop did not, under the particular facts of that case, gear down into a consensual encounter).

Consensual encounters "need not be predicated on any suspicion of the person's involvement in wrongdoing, and remain consensual as long as the citizen voluntarily cooperates with the police." *Payne*, 14 Va. App. at 88, 414 S.E.2d at 870 (internal quotations and citations omitted). On the other hand,

if the encounter has the characteristics of a coercive interrogation, the officer must have a "reasonable, articulable suspicion" that criminal activity may be afoot. *McGee*, 25 Va. App. at 202, 487 S.E.2d at 263; *see Terry v. Ohio*, 392 U.S. 1, 21-22, 30 (1968). About this standard, the Virginia Court of Appeals has explained:

> There is no litmus test for reasonable suspicion. Each instance of police conduct must be judged for reasonableness in light of the particular circumstances. In order to determine what cause is sufficient to authorize police to stop a person, cognizance must be taken of the totality of the circumstances — the whole picture.

*Harmon v. Commonwealth*, 15 Va. App. 440, 445, 425 S.E.2d 77, 79 (1992) (citations and internal quotation marks omitted).

Under *Terry*, actual proof that "criminal activity *is* afoot is not necessary; the record need only show that it *may* be afoot." *Harmon*, 15 Va. App. at 444, 425 S.E.2d at 79 (emphasis in original); *see also Hamlin*, 33 Va. App. at 501, 534 S.E.2d at 366. The test for reasonable suspicion, therefore, is "less stringent than the test for probable cause." *Clarke v. Commonwealth*, 32 Va. App. 286, 295, 527 S.E.2d 484, 488 (2000) (citation omitted). That so, "reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Id.* Moreover, when determining if reasonable suspicion exists, courts should take into account that "trained law enforcement officers may be able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." *Hodnett*, 32 Va. App. at 691, 530 S.E.2d at 436 (citations omitted); *see also Buck*, 20 Va. App. at 302, 456 S.E.2d at 536.

In light of these principles, Brown's first argument — that the officers violated the Fourth Amendment by questioning him — must be rejected. The initial questioning did not rise to the level of a *Terry* detention. Officer Cooper approached the group as "they were walking" down a public road. Hearing Transcript at 26, 34. At that time, Brown willingly engaged in a conversation with Cooper. Officer Cooper did not coerce Brown's participation, directly or indirectly, in the dialogue.[4] From the totality of the circumstances, it appears

---

[4]  Compare these facts with the out-of-state cases surveyed by the Virginia Supreme Court in *Baldwin*, 243 Va. at 198-99, 413 S.E.2d at 649: "[C]ourts in other jurisdictions have agreed that not every police-citizen encounter is a seizure under the Fourth Amendment. *See e.g., People v. King*, 72 Cal. App. 3d 346, 348, 139 Cal. Rptr. 926, 927 (1977) (no seizure when officer called to person walking away from him, "Danny, stop, I want to talk to you"); *Richardson v. United States*, 520

clear that the officers "detained" Brown *after* the plastic bags had been inspected and the questioning ended. *See* Hearing Transcript at 29. For that reason, none of the testimonial evidence obtained during the questioning should be rendered inadmissible under the exclusionary rule.[5]

Brown's motion, however, fails for another reason. Even if Officer Cooper did restrain Brown's freedom from the first moment of their conversation and thereby subject him to a "seizure" under *Terry*, Cooper had a reasonable, articulable suspicion that Brown and his two friends may have been engaged in criminal conduct. The witness suggested that all three, as a group, suspiciously showed up at an office that had been closed for some time. One of the three, the female, attempted in a state of apparent panic to open a locked door after hours. She "ran away" upon seeing the "clean-up personnel" in the closed office. *Id.* at 23. Carrying plastic bags, the group then ran together at a "high rate of speed as if to get away from somewhere." *Id.* at 19.

Given these suspicious circumstances, Brown does not contest that grounds for a *Terry* stop existed to "question the female." *Id.* at 30. Yet these same grounds, it naturally follows, existed for stopping Brown due to his obvious connection to the group. He arrived at the scene with the female,

---

A.2d 692, 696 (D.C. App.), *cert. denied*, 484 U.S. 917 (1987) ("where . . . a police officer approaches an individual on the street, identifies himself as a police officer, and asks the individual a few questions, a seizure has not occurred for Fourth Amendment purposes"); *United States v. Burrell*, 286 A.2d 845, 846 (D.C. App. 1972) (where officer placed his hand on appellee's elbow and asked to speak with him this "initial confrontation with appellee did not amount to . . . a 'seizure', within the purview of *Terry*"); *People v. Tilden*, 70 Ill. App. 3d 859, 863, 388 N.E.2d 1046, 1049 (1979) (where officer asked person walking away from him to return and produce identification "it cannot be said that . . . [this] constituted a *Terry* stop"); *People v. Ortiz*, 18 Ill. App. 3d 431, 433, 305 N.E.2d 418, 420 (1973) ("mere calling to defendant to approach the police car did not amount to a 'stop'").

[5] At oral argument, both the Commonwealth and Brown framed the issue primarily as a *Terry* stop analysis. And the Court's comments at the hearing assumed these analytical boundaries. "It is well understood," however, "that circuit court judges act only through written, signed orders." *Bennett v. Commonwealth*, 33 Va. App. 335, 344, 533 S.E.2d 22, 27 (2000) (*en banc*) (court's written order, not "brainstorming" recorded in the transcript, controls). In addition, judicial estoppel does not apply to issues of law. Thus, even if the Commonwealth had expressly "conceded" away the consensual encounter issue (which it did not), "concessions in respect to conclusions of law are not binding upon the parties or the court." *Glasco v. Commonwealth*, 257 Va. 433, 447, n. 7, 513 S.E.2d 137, 145, n. 7 (1999) (concurring opinion) (citing *Tuggle v. Commonwealth*, 230 Va. 99, 111, n. 5, 334 S.E.2d 838, 846, n. 5 (1985)).

carried a similar plastic bag as the female, suspiciously ran away from the scene with the female, and retrieved all of the plastic bags when the police approached the group. If a reasonable suspicion existed that the female was attempting an unlawful entry, Brown easily could have been suspected as a principal in the second degree.

Brown's second contention goes to the scope of the questioning. Brown argues that the questions put to him were outside "the scope of the reason for the stop." Brown Letter Brief at 2 (Oct. 16, 2000). This argument, however, presumes the questioning took place after Brown's seizure during a *Terry* stop — a position the Court does not accept. In any event, even if the seizure had taken place prior to the first question related to the plastic bags, this line of questioning could not fairly be ruled out-of-bounds for the investigating officers.

Questions of scope, whether in terms of duration or the topics of the investigating officer's inquiry, must be referred back to the basic reasonableness standard. The text of the Fourth Amendment draws the line there; so too must the courts. When "evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Harris v. Commonwealth*, 33 Va. App. 325, 333-34, 533 S.E.2d 18, 22 (2000) (quoting *Washington v. Commonwealth*, 29 Va. App. 5, 15, 509 S.E.2d 512, 517 (1999) (*en banc*)). "The test is whether the police methods were calculated to confirm or dispel the suspicion quickly and with minimal intrusion upon the person detained." *Id.* (citation omitted); *see also Hamlin*, 33 Va. App. at 501-02, 534 S.E.2d at 366.

In this case, the three suspects had suspiciously run away from what appeared to one bystander as an attempted unlawful entry. They carried with them one or more plastic bags. *See* Hearing Transcript at 26, 34-35. Before Officer Cooper first inquired about the bags, Brown had taken possession of all of them. *Id.* at 35. Common sense and ordinary human experience led Cooper to ask about the contents of the bags and to find out who owned them.

For a court to dissect an investigating officer's questioning at this level of specificity and to scrutinize each question under the microscope of hindsight would be both unworkable and unwise. Given the minimal intrusion experienced by Brown for simply being asked these questions, along with the limited number and duration of the questions, the Court finds that Officer Cooper did not violate the reasonableness standard by inquiring about the plastic bags.

The final issue involves the search of the interior of the plastic bags. Brown argues that, even if Officer Cooper had legitimate grounds to ask questions about the bags, he had no right to search them. As with consensual

questioning, however, a search conducted with the individual's permission does not implicate the Fourth Amendment. Once given, consent remains lawful as long as the individual does not withdraw the consent and the searching officers do not exceed the scope of the consent. *See Grinton v. Commonwealth*, 14 Va. App. 846, 850-51, 419 S.E.2d 860, 862-63 (1992).

The Fourth Amendment test for a valid consent to search, the U.S. Supreme Court has held, "is that the consent be voluntary" and not the product of coercion or duress. *Ohio*, 519 U.S. at 40. Voluntariness presents a question of fact to be determined from the "totality of all the circumstances." *Jones v. Commonwealth*, 32 Va. App. 30, 40, 526 S.E.2d 281, 285 (2000) (quoting *Deer v. Commonwealth*, 17 Va. App. 730, 735, 441 S.E.2d 33, 36 (1994)).

In this case, Officer Cooper did not forcibly take the bags from Brown or coerce him into opening them for inspection. Officer Cooper asked Brown for "consent" to search. Hearing Transcript at 28-29. Cooper began his search only after receiving Brown's permission to do so. *Id.* at 29. Nothing about this episode suggests that Cooper overwhelmed Brown's volition or overcame his will. Furthermore, even if Brown had been "in custody at the time the consent," the fact of a detention would not by itself "invalidate the consent." *Jones*, 32 Va. App. at 39-40, 526 S.E.2d at 285 (quoting *Commonwealth v. Rice*, 28 Va. App. 374, 378, 504 S.E.2d 877, 879 (1998)).[6]

In sum, the Court denies Brown's motion to suppress the evidence obtained during the questioning of Brown by Officer Cooper and the search of the white plastic bags. Officer Cooper's investigation transgressed none of the constitutional limits set by the Fourth Amendment's proscription of unreasonable searches and seizures. It is so ordered.

---

[6]  At oral argument, Brown initially contended that the police officers' reliance on an inadequate anonymous tip violated the reliability principle recently clarified in *Florida v. J. L.*, 120 S. Ct. 1375 (2000). Brown's counsel later conceded, correctly so, that the evidence showing the officers' reliance on the face-to-face interview of the witness "brought Mr. Brown's case out of the *Florida v. J. L.* parameters . . . ." Brown Letter Brief at 1 (Oct. 16, 2000); *see also* Hearing Transcript at 27.