COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Decker, Judges Humphreys and O'Brien
Argued by videoconference

UNPUBLISHED

RANDY LEE LASSITER, JR.

v.        Record No. 0422-20-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE MARY GRACE O'BRIEN
JULY 20, 2021

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Mary Jane Hall, Judge

Taite A. Westendorf (Westendorf & Khalaf, PLLC, on briefs), for
appellant.

Robert H. Anderson, III, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


A jury convicted Randy Lee Lassiter, Jr. ("appellant") of robbery, in violation of Code

§ 18.2-58, and wearing a mask or hood to conceal his identity, in violation of Code § 18.2-422.[1]

Appellant contends the court erred by allowing testimony from a rebuttal witness "because the

Commonwealth's mid-trial Brady disclosures violated appellant's due process rights and deprived

him of a fair trial."[2]  Finding no error, we affirm.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Appellant was also charged with abduction, in violation of Code § 18.2-48, use of a
firearm in commission of abduction, in violation of Code § 18.2-53.1, and use of a firearm in
commission of robbery, in violation of Code § 18.2-53.1.  The court granted appellant's motion to
strike the abduction charge and its corresponding firearm charge and declared a mistrial on the
remaining firearm count after the jury failed to reach a verdict on it.

[2] While represented by appellate counsel, appellant filed a "Motion for Bond Pending
Appeal" pro se in this Court.  Because he was represented by counsel, we do not consider his pro se
motion.

BACKGROUND

On January 3, 2018, Pamela Williford and Juanita Amin were working the closing shift at a Tinee Giant convenience store in Norfolk. At approximately 11:25 p.m., appellant entered the store wearing a black hoodie with the hood up and a mask or scarf over the bottom half of his face. He was carrying a silver handgun and a black duffel bag.

Appellant pointed the gun at Williford and ordered the women to go behind the counter. He told Williford to "give him all the money now." Williford opened the cash register, and appellant reached over the counter, took cash from the register drawer, and stuffed it into his duffel bag. He demanded more money, telling the women that "wasn't all [of] the cash." Williford retrieved a concealed cash register drawer and placed it on the counter. Appellant removed the money from that drawer and demanded cigarettes and cigars. After Williford and Amin put cigarettes and cigars into appellant's duffel bag, he left the store.

Williford immediately called the police. Detectives Jose Oyola and Alexander Kay of the Norfolk Police Department arrived at the store and questioned Amin and Williford separately. The women provided similar descriptions of the robber. According to Williford, appellant was a "regular customer" of the Tinee Giant; in fact, she had seen him in the store the day before.

Five days later, on January 8, Williford saw appellant in the store again. She identified appellant as the robber to her manager. The police subsequently obtained the store's surveillance footage, which included footage of the robbery as well as footage of appellant in the store on January 2 and 8.

On February 7, appellant's girlfriend, Shawnda McClease, informed Detective Kay that she saw a news report of the robbery and believed that appellant was "the individual . . . that robbed the Tinee Giant." McClease told the detective that appellant was at her residence on the night of the robbery and left with a black backpack. Later that day, Detective Kay showed Williford a

six-person photographic lineup containing appellant's picture. Williford positively identified appellant from the lineup and completed a "Statement of Confidence in Identification," in which she described some of appellant's physical characteristics and noted that he was a "regular customer" whom she "talked to . . . all the time."

Appellant was arrested on February 10. Three days later, McClease went to the police station and recanted her earlier statement. She stated that Detective Kay was "going in the wrong direction" because appellant did not commit the robbery.

On August 26, 2019, two days before trial, the Commonwealth sent appellant's counsel a witness list, which included the name "Ranuel Ramos." On the day of trial, during *voir dire*, the court advised the prospective jurors of the names of all witnesses and potential witnesses, including Ramos.

Both Amin and Williford testified as eyewitnesses. Amin stated that she recognized appellant during the robbery because he was "a regular customer" who "would come in every night about the same time." She identified appellant from the January 3 robbery footage that was played for the jury. Williford also identified appellant from the robbery footage, as well as the footage of appellant from January 2 and 8. On cross-examination, both women confirmed unequivocally that appellant was the robber.

McClease testified on appellant's behalf. She stated that she and appellant lived together about half a mile from the Tinee Giant, where they frequently shopped. She identified appellant in a still image taken from the January 2 footage; however, she testified that on January 3, appellant was home with her all night. She denied ever telling Detective Kay that she believed appellant had committed the robbery.

On rebuttal, Detective Kay testified that McClease informed him on February 7, 2018 that she believed appellant committed the robbery. The detective acknowledged that following appellant's arrest, McClease came to the police station and recanted her statement.

The Commonwealth also called Ramos, who had been incarcerated with appellant in Norfolk City Jail, to testify in rebuttal. Appellant objected, asserting that the Commonwealth suppressed information about Ramos in violation of Brady v. Maryland, 373 U.S. 83 (1963). Specifically, appellant argued that he was "ambushed" because he did not know "what [Ramos was] going to say, whether or not [Ramos and appellant] were actually housed together, whether [Ramos] saw information on the news, [and] whether or not he was made some kind of an offer [for] leniency."

In response, the prosecutor stated:

> I have to provide exculpatory information. The Commonwealth has no exculpatory information regarding Mr. Ramos with the exception of his [criminal] record which I will provide to [counsel].
>
> I will give that to him as soon as I speak to Mr. Ramos. He does have a record. No specific offers have been made in the case. If that had been the case, I would give [appellant] a copy of a plea agreement or something like that, but I have no exculpatory information as it pertains to Mr. Ramos.

Appellant advised the court that at the beginning of trial, the prosecutor told him that she would not call Ramos unless appellant testified. When questioned about this statement, the prosecutor acknowledged that "was my plan at that point, but I have decided we're going to call him this morning."

The court granted appellant a brief recess to call the city jail to determine whether Ramos and appellant had been housed together. However, an employee in the jail records department responded that additional time was necessary to review the records and confirm whether the men

- 4 -

were housed together. Appellant reiterated his objection to Ramos testifying but did not ask for a continuance. The court acknowledged appellant's "due process objection" and overruled it.

In his testimony, Ramos admitted that he had eleven prior felony convictions and two pending felony charges. Ramos testified that he shared a cell with appellant for a weekend but did not know anything about appellant or his charges beforehand. He stated that while housed together, he and appellant had a five-minute conversation about reasonable doubt, during which appellant exclaimed, "[T]here's no way they can find [me] guilty because [I] had a mask on." Ramos also stated that he had never testified for the Commonwealth previously, and although he hoped to receive "some leniency" in his upcoming cases, he had not been promised anything in exchange for testifying, such as a favorable disposition of his pending charges.

The jury subsequently found appellant guilty of robbery and wearing a mask or hood to conceal his identity.

Appellant moved to set aside the verdict based on insufficient identification. At a hearing on the motion, the court also allowed appellant to raise *pro se* the issue of his "due process objection to exclude [Ramos's testimony] at trial." The court denied the motion and noted that even without Ramos's testimony, "the evidence submitted by the two employees of the convenience store was pretty overwhelming . . . [and] . . . [t]his case was proven way beyond a reasonable doubt, almost beyond any doubt."

ANALYSIS

Appellant contends the court erred by allowing Ramos to testify because the Commonwealth's disclosures about the witness were untimely under Brady.[3]

---

[3] In his reply brief, appellant also asserts that the Commonwealth "duped [appellant] to give up" his right to testify by "reneg[ing]" on its representation not to call Ramos as a rebuttal witness unless appellant testified. Appellant contends that the Commonwealth's "false promise[]" constituted a constitutional violation. Without commenting on the propriety of the prosecutor's actions, we note that appellant did not present this argument to the trial court, and therefore we will

When a Brady claim is reviewed on appeal, "the burden is on appellant to show that the trial court erred." Gagelonia v. Commonwealth, 52 Va. App. 99, 112 (2008) (quoting Galbraith v. Commonwealth, 18 Va. App. 734, 739 (1994)). Although a "trial court's factual findings will not be disturbed absent clear error[,] . . . we review the trial court's legal conclusions *de novo*." Church v. Commonwealth, 71 Va. App. 107, 116 (2019). Further, "constitutional arguments are questions of law that [appellate courts] review *de novo*." Shivaee v. Commonwealth, 270 Va. 112, 119 (2005).

The Fourteenth Amendment of the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1, cl. 3. In Brady, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87; see Commonwealth v. Tuma, 285 Va. 629, 634 (2013) ("Under the Brady rule, the prosecution's suppression of evidence favorable to the accused and material to either guilt or punishment violates due process.").[4]

To establish a due process violation under Brady ("a Brady violation"), a defendant must prove the following three components: (1) evidence favorable to the defendant existed; (2) the

---

not consider it on appeal. See Rule 5A:18; see also Edwards v. Commonwealth, 41 Va. App. 752, 761 (2003) (*en banc*) ("Although Rule 5A:18 allows exceptions for good cause or to meet the ends of justice, appellant does not argue that we should invoke these exceptions. . . . We will not consider, *sua sponte*, a 'miscarriage of justice' argument under Rule 5A:18.").

[4] In addition to the federal constitution, appellant relies on a state constitutional provision stating that "in criminal prosecutions a man hath a right . . . to call for evidence in his favor." Va. Const. art. I, § 8. Because "due process protections afforded under the Constitution of Virginia are co-extensive with those of the federal constitution, the same analysis will apply to both." Shivaee, 270 Va. at 119. Accord Lilly v. Commonwealth, 50 Va. App. 173, 184 (2007) (stating that federal due process principles "subsume any analysis of parallel provisions in the Virginia Constitution"). See, e.g., Moreno v. Commonwealth, 10 Va. App. 408, 411-12, 416-17, 420 (1990).

Commonwealth suppressed that evidence by failing to timely disclose it to the defendant; and (3) the defendant was prejudiced by the nondisclosure. See Strickler v. Greene, 527 U.S. 263, 281-82 (1999); Workman v. Commonwealth, 272 Va. 633, 644-45 (2006); see also Tuma, 285 Va. at 635, 637 (holding that favorable evidence is not "suppressed" in violation of Brady if it is disclosed in "sufficient time to effectively use it at trial").

A. Favorable Evidence

"Favorable" evidence includes exculpatory evidence as well as evidence that "may be used for impeachment." Workman, 272 Va. at 644; see United States v. Bagley, 473 U.S. 667, 676 (1985). In Virginia, the credibility of any witness may be impeached by evidence of that witness' past conviction for a misdemeanor involving moral turpitude or a felony. Va. R. Evid. 2:607(a)(ii), 2:609(b); see Pearce v. Commonwealth, 53 Va. App. 113, 119-20 (2008). A witness may also be impeached by evidence that he is biased in favor of the prosecution. Va. R. Evid. 2:610; see Moreno v. Commonwealth, 10 Va. App. 408, 415 (1990).

Appellant argues that "[t]he Commonwealth's failure to provide any information relating to Ramos until mid-trial" violated his due process rights under Brady. However, the record shows that the only favorable information the Commonwealth was required to give appellant pursuant to Brady was Ramos's criminal record. Ramos's record included numerous felony convictions that could be used to impeach his credibility. See Bramblett v. Commonwealth, 257 Va. 263, 276 (1999) ("Evidence of the prior convictions of a witness is impeachment evidence under Brady."). Additionally, his criminal record reflected numerous pending felony charges that could be used to show Ramos's bias if he expected leniency in future disposition of those charges. See Moreno, 10 Va. App. at 415 (stating that "[b]ias as a form of impeachment . . . falls within the Brady requirement to disclose"). In contrast, all of the other "information relating to Ramos" — including his name, age, and race and the substance of his testimony about appellant's incriminating

- 7 -

statements while they were housed together — was not favorable evidence subject to mandatory disclosure because appellant could not have used that information to exculpate himself or impeach Ramos.

Appellant contends that the fact that Ramos was a jailhouse informant constituted impeachment evidence. We disagree.

A defendant may impeach a government informant's credibility by showing that the informant received a benefit from the government — such as a promise of favorable disposition in a future criminal case — in exchange for his testimony. See Giglio v. United States, 405 U.S. 150, 154-55 (1972); Lovitt v. Warden, Sussex I State Prison, 266 Va. 216, 246 (2003). "However, when a person does not receive a benefit from providing such information, and later testifies as a prosecution witness, the mere fact of his prior cooperation with the government agents does not constitute impeachment evidence subject to disclosure" under Brady. Lovitt, 266 Va. at 246. Here, Ramos did not receive any promised benefit from the Commonwealth in exchange for his testimony. Therefore, Ramos's mere status as a jailhouse informant did not constitute impeachment evidence subject to disclosure.

Appellant suggests that any information at all about Ramos's existence and informant status was favorable because it would have allowed defense counsel to investigate other potential favorable evidence, such as

> whether there was independent corroboration of the informant's testimony; the extent to which the details of the testimony could be obtained from a source other than the defendant; the informant's possible previous experience as an informant; whether the informant has previously provided reliable or unreliable information; the circumstances under which the informant initially provided the information to the police or the prosecutor; and the specific circumstances of the informant's pending case and the nature of any benefit he was hoping to receive.

However, "Brady is 'a disclosure rule, not a discovery rule.'" Tuma, 285 Va. at 635 (quoting United States v. Higgins, 75 F.3d 332, 335 (7th Cir. 1996)). "'A defendant cannot simply allege the presence of favorable material and win reversal of his conviction.' Rather, the defendant must prove the favorable character of the evidence he claims has been improperly suppressed. Speculative allegations are not adequate." Jones v. Commonwealth, 32 Va. App. 30, 45-46 (2000) (quoting Hughes v. Commonwealth, 18 Va. App. 510, 526 (1994) (en banc)); Lowe v. Commonwealth, 218 Va. 670, 679 (1977) (stating that "conjecture" is insufficient to establish a Brady violation).

The Commonwealth "ha[d] a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995). The Commonwealth proffered — and Ramos confirmed at trial — that it did not offer any plea agreements to Ramos in exchange for his testimony. The Commonwealth also proffered that it was unaware of any other "exculpatory information regarding Mr. Ramos with the exception of his [criminal] record." Nothing in the record before us rebuts these proffers. Thus, appellant's speculation that he *may* have discovered additional exculpatory or impeachment material stemming from the disclosure of Ramos's anticipated testimony is insufficient to prove the favorable character of any evidence he claims had been improperly suppressed. See Jones, 23 Va. App. at 45-46.

Accordingly, the only favorable evidence known to the Commonwealth that was subject to disclosure was Ramos's criminal record.

### B. Suppression of Evidence

Appellant asserts that the Commonwealth's delay in disclosing Ramos's criminal record until mid-trial constituted a Brady violation. However, evidence that is disclosed mid-trial is not

"suppressed" if a defendant has "sufficient time to make use of [the evidence] at trial." See Tuma, 285 Va. at 635 (quoting Read v. Va. State Bar, 233 Va. 560, 564-65 (1987)).

In Jones v. Commonwealth, a defendant received a copy of a prosecution witness' criminal record immediately preceding the witness' testimony. 32 Va. App. at 45. The defendant moved for a mistrial based on the timing of the disclosure. Id. at 45-46. This Court held that the witness' criminal record was not suppressed because it was disclosed in time for the defendant "to cross-examine [the witness] effectively." Id. at 46.

Here, the Commonwealth supplied appellant with Ramos's criminal record prior to his direct examination. This disclosure was timely because appellant had ample opportunity to review the record and use it to impeach Ramos's credibility. See, e.g., Tuma, 285 Va. at 635. In fact, appellant extensively questioned Ramos about the convictions and pending charges on his record during cross-examination and repeatedly referred to the record during his closing argument.

Because the only favorable evidence subject to Brady disclosure was Ramos's criminal record and appellant received that record in time to effectively use it at trial, we hold that the court did not err by allowing Ramos to testify in the Commonwealth's rebuttal case.[5]

Affirmed.

_____

[5] Because appellant failed to prove that the Commonwealth suppressed Ramos's criminal record in violation of Brady, we do not address whether appellant was prejudiced by the timing of that record's disclosure. See Porter v. Warden of the Sussex I State Prison, 283 Va. 326, 332 (2012) (explaining that an appellate court does not reach the issue of prejudice unless it first determines that favorable evidence was suppressed); see also Strickler, 527 U.S. at 281-82 (listing the three components of a Brady violation).